# UNITED STATES DISTRICT COURT FOR THE
# MIDDLE DISTRICT OF PENNSYLVANIA

KRISTEN RUBBICO-ROBINSON, :
:
Plaintiff : No. 3:12-CV-00450
:
vs. : (Judge Nealon)
:
CAROLYN W. COLVIN, ACTING :
COMMISSIONER OF SOCIAL :
SECURITY, :
:
Defendant :

**FILED
SCRANTON**

NOV 2 7 2013

PER _____
DEPUTY CLERK

## MEMORANDUM

## BACKGROUND

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Kristen Rubbico-Robinson's (hereinafter referred to as "Rubbico") claim for social security disability insurance benefits.

Rubbico protectively filed[1] her application for disability insurance benefits on November 3, 2009. Tr. 15, 70, 103-14 and 119.[2] The application was initially denied by the Bureau of Disability Determination on March 31, 2010.[3] Tr. 79-83.

---

1. Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits. A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

2. References to "Tr.__" are to pages of the administrative record filed by the Defendant as part of the Answer on May 15, 2012.

3. The Bureau of Disability Determination is an agency of the
(continued...)

On May 11, 2010, Rubbico requested a hearing before an administrative law judge. Tr. 86-87. After 11 months had passed, a hearing was held before an administrative law judge on April 12, 2011. Tr. 47-69. At the administrative hearing Rubbico and a vocational expert testified. Id. Rubbico was represented by counsel at the hearing. Id. On May 6, 2011, the administrative law judge issued a decision denying Rubbico's application. Tr. 15-26. As will be explained in more detail infra, the administrative law judge found that Rubbico could perform past relevant sedentary work[4] as a customer service assistant and she could also perform other sedentary jobs in the economy.[5] Tr. 23-26.

---

3. (...continued)
state which initially evaluates applications for disability insurance benefits on behalf of the Social Security Administration. Tr. 80.

4. Past relevant employment in the present case means work performed by Rubbico during the 15 years prior to the date her claim for disability was adjudicated by the Commissioner. 20 C.F.R. §§ 404.1560 and 404.1565.

5. The terms sedentary, light, medium and heavy work are defined in the regulations of the Social Security Administration as follows:

> (a) *Sedentary work*. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

> (b) *Light work*. Light work involves lifting no more than 20 pounds at a time with frequent lifting or
> (continued...)

2

On July 7, 2011, Rubbico filed a request for review with the Appeals Council and, after 6 months had passed, the Appeals Council on January 25, 2012, concluded that there was no basis upon which to grant Rubbico's request for review. Tr. 1-9. Thus, the administrative law judge's decision stood as the final decision of the Commissioner.

Rubbico then filed a complaint in this court on March 12, 2012. Supporting and opposing briefs were submitted and the

---

5.  (...continued)
carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

(c) *Medium work.* Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can do sedentary and light work.

(d) *Heavy work.* Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can do heavy work, we determine that he or she can also do medium, light, and sedentary work.

20 C.F.R. § 404.1567.

appeal[6] became ripe for disposition on August 14, 2012, when Rubbico filed a reply brief.

Disability insurance benefits are paid to an individual if that individual is disabled[7] and "insured," that is, the individual has worked long enough and paid social security taxes. The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured." It is undisputed that Rubbico meets the insured status requirements of

---

6. Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal." M.D.Pa. Local Rule 83.40.1.

7. To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A). Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

the Social Security Act through December 31, 2013. Tr. 15, 17, 105 and 107.

Rubbico was born in the United States on October 17, 1973, and at all times relevant to this matter was considered a "younger individual"[8] whose age would not seriously impact her ability to adjust to other work. 20 C.F.R. §§ 404.1563(c). Tr. 62, 70, 103, 105 and 119-120.

Rubbico obtained a General Equivalency Diploma (GED) in 1994 and can read, write, speak and understand the English language and perform basic mathematical functions such as paying bills, counting change, handling a savings account and using a checkbook and money orders. Tr. 71, 123, 133 and 155. Rubbico reported that during her elementary and secondary schooling she attended regular education classes. Tr. 133. After obtaining a GED, Rubbico did not complete "any type of special job training, trade or vocational school." Id.

Rubbico has past relevant employment as (1) a bank teller which was described by a vocational expert as skilled, light work as generally performed in the economy but medium work as actually performed by Rubbico; (2) a bartender described as semi-skilled, light work as generally performed but medium as actually performed; (3) a customer service assistant for a health insurance company described as skilled, sedentary work; (4) a

_____

8. The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49." 20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1).

customer service assistant for a security systems firm described as skilled, sedentary work; (5) a waitress described as semi-skilled, light work as generally performed but medium work as actually performed; and (6) an operation specialist/travel clerk described as semi-skilled, light work as generally performed but medium work as actually performed. Tr. 62-63 and 114-118.

Rubbico reported that she worked as a waitress during 1996; as a bartender from 1995 to 1996; as a bank teller from 1996 to 1998; as a customer service assistant from October, 1998 to August, 2003, and from October, 2003 to February, 2006; and as an operations specialist/travel clerk from August 21, 2006 to October 21, 2008. Tr. 125 and 136.

The records of the Social Security Administration reveal that Rubbico had earnings in the years 1989 through 2008. Tr. 106 and 112. Rubbico's annual earnings range from a low of $36.25 in 1995 to a high of $23,363.39 in 2005. Id. Rubbico's total earnings during those 20 years were $234,358.22. Id.

Rubbico claims that she became disabled on October 21, 2008,[9] because of both physical and mental problems. Tr. 124 and 173. The impetus for Rubbico's claimed disability is apparently a motor vehicle accident that occurred in May, 2007, and spinal surgery which took place in October, 2008. Tr. 163.

---

9. Rubbico was only 35 years of age on her alleged disability onset date.

The physical problems alleged include severe neck and back impairments and the pain associated with those impairments. Id. The mental impairment alleged is depression. Id. When asked at the administrative hearing what her main problem was that prevented her from working, Rubbico stated as follows:

> I have a lot of problems with weakness in my arms and hands where I drop things. I have – I get headaches from my neck and I don't have a whole lot of range of motion from my neck. One of the main problems I have is I can't sit for an extended period of time. I have to, like, sit for a little bit and then I have to walk around or stand up or then like lay down. It kind of – it goes through a cycle just to try to let some of the leg pain and the pain in my back to relieve some of that. I definitely – I don't focus as well as I used to. My memory is not as good as it used to, but it's mostly I just – I physically just – I can't do it. I – I would like nothing more than just to go back to work tomorrow and go back to normal life.

Tr. 51. Rubbico reported that she had not engaged in work activity since October 21, 2008. Tr. 17 and 124.

In a document entitled "Function Report - Adult" filed with the Social Security Administration in January, 2010, and during her testimony at the administrative hearing, Rubbico indicated that she lived with her husband and two children in a single family home; she checked her banking records, communicated on facebook, watched TV "often," assisted with her son's cyber-schooling, and grocery shopped. Tr. 55-56 and 152-159. Rubbico also alleged that she had "pain and weakness in both arms and hands, neck pain [and] headaches, limited mobility in neck due to fusion surgery[,] pain in lower back and righ[t] leg and weakness in right leg." Tr. 157. Rubbico in the function report when asked

7

to check items which her "illnesses, injuries, or conditions affect" did <u>not</u> check talking, hearing, seeing, understanding, following instructions and getting along with others. Tr. 157.

For the reasons set forth below, the Court will affirm the decision of the Commissioner denying Rubbico's application for disability insurance benefits.

## STANDARD OF REVIEW AND SEQUENTIAL EVALUATION PROCESS

Under 42 U.S.C. § 405(g) and relevant case law, the court is limited to reviewing the administrative record to determine whether the decision of the Commissioner is supported by substantial evidence. Counsel for the parties are familiar with the five-step sequential evaluation process that the Commissioner utilizes and the substantial evidence standard of review.[10]

---

10. Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Pierce v. Underwood</u>, 487 U.S. 552, 565 (1988)(quoting <u>Consolidated Edison Co. v. N.L.R.B.</u>, 305 U.S. 197, 229 (1938)); <u>Johnson v. Commissioner of Social Security</u>, 529 F.3d 198, 200 (3d Cir. 2008); <u>Hartranft v. Apfel</u>, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. <u>Brown</u>, 845 F.2d at 1213. In an adequately developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." <u>Consolo v. Federal Maritime Commission</u>, 383 U.S. 607, 620 (1966).
Substantial evidence exists only "in relationship to all the other evidence in the record," <u>Cotter</u>, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." <u>Universal Camera Corp. v. N.L.R.B.</u>, 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing

(continued...)

8

## MEDICAL RECORDS

Before the Court addresses the administrative law judge's decision and the arguments of counsel, Rubbico's medical records will be reviewed in detail and the Court will start with some records that predate Rubbico's alleged disability onset date of October 21, 2008.

The first document encountered is a prescription slip for physical therapy at Wellspring Physical Therapy (Wellspring), Forty Fort, Pennsylvania, issued on March 25, 2008, by Louise A. Breakstone, M.D., on behalf of Rubbico. Tr. 184 and 186. The stated basis for issuing the prescription was Dr. Breakstone's assessment that Rubbico suffered from lumbar radiculopathy.[11] Id.

---

10.  (...continued)
evidence or fails to resolve a conflict created by the evidence. Mason, 994 F.2d at 1064. The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-707. Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).
The Commissioner utilizes a five-step process in evaluating disability insurance benefits claims. See 20 C.F.R. § 404.1520; Poulos, 474 F.3d at 91-92. This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity, (2) has an impairment that is severe or a combination of impairments that is severe, (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment, (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id.

11.  Radiculopathy is a condition where one or more nerves or
(continued...)

The initial evaluation at Wellspring on March 26, 2008, reveals that the reason for referral was "[l]ow back pain radiating down [Rubbico's] right [lower extremity]." Tr. 186. That evaluation also revealed a moderate antalgic gait, muscular weakness primarily in the right lower extremity as compared to the left, limited range of motion of the lumbosacral spine and a positive sciatic nerve tension, slump and straight leg raise tests on the right.[12] Tr. 188. However, those tests were negative on the left and her reflexes and sensation were intact and equal bilaterally. Id.

Rubbico attended physical therapy at Wellspring on March 27 and April 3, 8, 10, 16 and 21, 2008. Tr. 197-209, 211-213 and 214-216. At the appointment on April 21, 2008, Rubbico had mild complaints of pain and difficulty, mild limitations in range of

_____

11. (...continued)
nerve roots are affected and do not work properly. The nerve roots are branches of the spinal cord. They carry signals to the rest of the body at each level along the spine. Radiculopathy is a result of disc herniation or an injury causing foraminal impingement of an exiting nerve (the narrowing of the channel through which a nerve root passes). See, generally, Radiculopathy, MedicineNet.com, http://www.medicinenet.com/ radiculopathy/article.htm (Last accessed November 20, 2013). A herniated disc is one cause of radiculopathy. Id.

12. The straight leg raise test is done to determine whether a patient with low back pain has an underlying herniated disc. The patient, either lying or sitting with the knee straight, has his or her leg lifted. The test is positive if pain is produced between 30 and 70 degrees. Niccola V. Hawkinson, DNP, RN, Testing for Herniated Discs: Straight Leg Raise, SpineUniverse, http://www.spineuniverse.com/experts/testing-herniated -discs-straight-leg-raise (Last accessed November 20, 2013). A positive slump test is also an indicator of the presence of a herniated disc.

motion and moderate limitations in flexibility. Tr. 215-216 and 221. Rubbico cancelled appointments which were scheduled for April 14, 23 and 29 and May 1, 2008, and was discharged from the physical therapy program on May 14, 2008. Tr. 210 and 217-223. At the time of discharge there was no improvement or decrease in Rubbico's functional abilities. Tr. 220-221.

On March 31, 2008, Rubbico had an MRI of the lumbar spine performed at the Center for Diagnostic Imaging, located in Forty Fort which revealed a mild right lateral disc herniation with "[e]xtruded disc material extend[ing] somewhat superiorly and right laterally." Tr. 290.

On April 17, 2008, Rubbico had an appointment with Mark H. Bell, M.D., at Advanced Pain Management Specialists located in Plains, Pennsylvania. Tr. 269-271. Rubbico complained of "constant pain extending from the right lower buttock area through the posterior right thigh into the right ankle" with "intermittent tingling and numbness in the right foot along the lateral aspect of the right foot and the plantar aspect." Tr. 269. The record of this appointment notes that Rubbico had attended physical therapy at Wellspring "without relief." Id. Except for positive musculoskeletal pain, a review of Rubbico's systems[13] was essentially negative, including no complaints of anxiety,

13. "The review of systems (or symptoms) is a list of questions, arranged by organ system, designed to uncover dysfunction and disease." A Practical Guide to Clinical Medicine, University of California, School of Medicine, San Diego, http://meded.ucsd.edu/ clinicalmed/ros.htm (Last accessed November 19, 2013).

depression, trouble sleeping, emotional disturbance or substance abuse. Tr. 269-270. A physical examination revealed that Rubbico was severely overweight (her height was 5'7" and she weighed 238 pounds);[14] flexion of the lumbar spine was moderately decreased causing increase in pain; extension and extension with rotation were decreased and caused right paravertebral tenderness and right sacroiliac joint tenderness; right and left lateral flexion caused pain in the lower buttock extending into the thigh; and Rubbico had moderate right sciatic notch tenderness. Tr. 270. Rubbico also had some slight decrease in functionality in the right lower extremity, a mildly antalgic gait and a strongly positive straight leg raising test on the right but negative on the left. Id. Dr. Bell's assessment was that Rubbico suffered from low back pain, lumbar herniated nucleus pulposus, lumbar radiculopathy and sacroiliitis. Tr. 271. Dr. Bell scheduled Rubbico for a series of "fluoroscopically guided right transforaminal" injections "at levels L5-S1 and S1. Id. Rubbico had those injections

_____

14. An individual of such height and weight has a body mass index of 37.3 and is considered obese. Center for Disease Control and Prevention. Healthy Weight, Adult BMI Calculator, http://www.cdc.gov/healthyweight/assessing/bmi/a dult_bmi/english_bmi_calculator/bmi_calculator.html (Last accessed November 20, 2013). "Doctors often use a formula based on [the person's] height and weight — called the body mass index (BMI) — to determine if [the person is] obese." Obesity, Definition, Mayo Clinic Staff, MayoClinic.com, http://www. Mayoclinic.com/health/obesity/DS00314 (Last accessed November 20, 2013). Adults with a BMI of 30 or higher are considered obese. Extreme obesity, also called severe obesity or morbid obesity, occurs when the person has a BMI of 40 or more. With morbid obesity, the person is especially likely to have serious health problems. Id.

administered by Joseph D. Paz, D.O., at Advanced Pain Management
Specialists on May 6 and 27, June 10 and July 22, 2008. Tr. 282-
285.

On April 24, 2008, Rubbico had a second MRI of the
lumbar spine performed at the Center for Diagnostic Imaging,
located in Forty Fort. Tr. 288-289. The MRI revealed a "moderate
sized right lateral disk extrusion (disk herniation). Extruded
disk material extend[ed] far right laterally as well as
superiorly. Overall size of extruded disk [was] 12 mm in greatest
longitudinal dimension. 18 mm in greatest transverse dimension and
9 mm in greatest [anterior posterior] dimension. . . causing right
foraminal narrowing and right nerve root compression." Tr. 288.
It was noted that "[c]ompared to last study dated 03/31/08, there
[was] interval worsening and . . . interval increase in the size
of extruded disk." Tr. 289.

On June 26, 2008, Rubbico had an MRI of the cervical
spine which revealed (1) a small central disc protrusion and small
focal annular tear at the C3-C4 level; (2) a broad based mild
central disc herniation at the C4-C5 level; and (3) mild disc
degeneration and a broad based mild disc herniation at the C6-C7
level. Tr. 286.

On July 2, 2008, Rubbico had an appointment with Dr.
Bell for a follow-up examination. Tr. 280-281. It was noted in
the record of this appointment that Rubbico had undergone a series
of transforaminal injections without significant improvement. Id.

13

The record of this appointment also reveals that Rubbico was a smoker[15] and worked in an office. Id. A physical examination revealed increased pain "with all range of motion" and a significantly positive straight leg raise test on the right. Id. Dr. Bell's assessment was that Rubbico suffered from a lumbar herniated nucleus pulposus at L4-L5, low back pain with radiculopathy and lumbar facet syndrome. Id. Rubbico had appointments with Dr. Paz on September 22 and October 13, 2008, and after October 21, 2008, the alleged disability onset date, with Dr. Bell on January 5, 2009, and there were similar physical examination findings and assessments made.[16] Tr. 274-279.

During this time period Rubbico was also attending physical therapy at John Heinz Institute of Rehabilitative Medicine (John Heinz) located in Wilkes-Barre. Tr. 226. As of January 22, 2009, Rubbico had attended 8 physical therapy sessions. Id. On that date Rubbico completed a form in which she stated that her pain was moderate and that she could sit in any chair as long as she liked. Tr. 227. As of April 2, 2009, Rubbico

---

15. Several records indicate that Rubbico had a 20-year history of smoking 1 pack of cigarettes per day. Tr. 372 and 439.

16. Oddly each of these records indicates that Rubbico was working full-time at a travel agency. These records also indicate that Rubbico was under the care of a Dr. Schlifka, a neurosurgeon and that Rubbico was scheduled for neck surgery. The record of the January 5, 2009, appointment indicates that the neck surgery was performed by Dr. Schlifka on October 24, 2008, and that Rubbico had an upcoming appointment with Dr. Schlifka on January 29, 2009. Tr. 274.

had attended 20 physical therapy sessions at John Heinz and was discharged from the program. Tr. 256.

Rubbico on February 6, 2009, had an appointment with John Kline, M.D., at Northeastern Rehabilitation Associates. Tr. 326-327. The record of this appointment reveals that Rubbico was "independent with activities of daily living as well as mobility without the utilization of an assistive device or adaptive equipment" and that "[c]urrently she is a computer systems operator for a travel company." Tr. 326. During a review of Rubbico's systems by Dr. Kline, Rubbico denied any muscle weakness. Tr. 327. A physical examination revealed normal muscle "strength throughout" and normal sensation to light touch. Id. Rubbico's reflexes were normal and from a psychological standpoint she had a normal mood and affect. Id. Dr. Kline did note that Rubbico had "significant tenderness with palpable muscle spasms in both cervical paraspinals[17] and mid aspect of both upper trapezii" but she had a negative Spurling's test on both the left and right.[18] Id. Dr. Kline's assessment was that Rubbico suffered

17.  The muscles that run along side the spinal column are referred to as the paraspinal muscles. They provide support to the spine and assist in spine movement.

18.  The Spurling's test is an examination to determine whether a patient suffers from cervical spondylosis or radiculopathy. It is an "evaluation for cervical nerve root impingement in which the patient extends the neck and rotates and laterally bends the head toward the symptomatic side; an axial compression force is then applied by the examiner through the top of the patient's head; the test is considered positive when the maneuver elicits the typical radicular arm pain." MediLexicon, Definition:
(continued...)

from right cervical radiculopathy; C4 corpectomy and C3 through C5 laminectomy and fusion with post laminectomy syndrome; and lumbar disc herniation, for potential decompression.  Id.  Dr. Kline prescribed pain medications.  Id.

Rubbico had a follow-up appointment with Dr. Kline on April 17, 2009. Tr. 328-329.  At that appointment Rubbico complained of neck discomfort and pain radiating into the upper extremities. Id.  Physical examination findings were mostly normal and from a psychological standpoint Rubbico has a normal mood and affect. Id.  Dr. Kline did note "significant tenderness of the mid aspect of the cervical spine" and "limited active range of motion."  However, Rubbico had a negative straight leg raise test in both the seated and supine positions. Id.  Dr. Kline's diagnostic assessment was the same as the assessment he gave on February 6, 2009. Tr. 329.  Dr. Kline prescribed pain medications. Id.

On June 12 and July 7, 2009, Rubbico had appointments with Dr. Breakstone regarding ongoing back and neck pain. Tr. 310-313.  The physical examination findings with respect to these two appointments are limited.  On June 12, 2009, Rubbico weighed 243 pounds, had an antalgic gait, some right lumbar spasm and a positive straight leg raising test on the right. Id.  Dr. Breakstone's assessment was that Rubbico suffered from "lumbar

---

18.  (...continued)
'Spurling Test," http://www.medilexicon.com/medicaldictionary
.php?t=90833 (Last accessed November 9, 2013).

radiculopathy - worsening." Tr. 311. On July 7, 2009, Rubbico
weighted 238 pounds, had positive straight leg raising tests
bilaterally, could not stand on toes and the ankle jerk reflex was
absent on the right. Tr. 313. Dr. Breakstone's assessment was
that Rubbico suffered from worsening lumbar radiculopathy,
cervicalgia,[19] and depression. Id. The record of this
appointment does not contain any mental status examination
findings.[20] Dr. Breakstone prescribed the antidepressant
medication Celexa. Id.

On July 15, 2009, Rubbico had an appointment with Dr.
Kline regarding ongoing neck discomfort. Tr. 330. Dr. Kline noted
that "it was felt that she would not require any surgical
intervention." Id. The results of a physical examination were
essentially normal other than Rubbico continued to have limited
range of motion as well as spasm in both cervical paraspinals and
she demonstrated mild discomfort in the low back when engaging in
range of motion testing. Tr. 330. Dr. Kline's impression was the
same as stated by him on February 6 and April 17, 2009, except Dr.

---

19. Cervicalgia is neck pain which does not radiate outward to
the arms, i.e., localized neck pain. Cervicalgia,
MedConditions.net, Dictionary of medical conditions terminology,
http://medconditions.net/cervicalgia.html (Last accessed November
20, 2013).

20. The form utilized by Dr. Breakstone indicates that if an
item is not checked as either normal or abnormal it was not
examined. Tr. 310. The only items checked normal on the form
were with respect to the eyes and the only items checked abnormal
were gait and station and joint inspection/palpation. Tr. 310-
311.

17

Kline no longer included the diagnosis of cervical radiculopathy. _Id._ Dr. Kline prescribed pain medications. Tr. 330-331.

On July 18, 2009, Rubbico had an MRI of the lumbar spine performed at the Center for Diagnostic Imaging which revealed the following:

> Modest dessication of the nuclei at L4-5 and L5-S1. No significant disk space narrowing. Modest annular bulging at L1-2, L4-5 and L5-S1. No large disk protrusion or spondylotic changes. No significant arthropathic changes of the articular facets. Central canal caliber is normal. Modest front/back narrowing of the right foramen at L5-S1. There may be minimal subligamentous disk extending superior to the disk space and to the right at L4-5. <u>This is much less pronounced than was seen on previous examination of 4/24/08.</u>

Tr. 305 (emphasis added). The conclusion of the physician who reviewed the MRI and prepared the report was that there was "[d]efinite improvement at L4-5" and "[p]reviously demonstrated central and right lateral disk much less pronounced." Tr. 306.

On July 31, 2009, Rubbico had an appointment with Dr. Breakstone to "go over results of MRI." Tr. 314-315. Although the report of this appointment contains no objective physical examination other than weight and vital signs[21] or mental status findings, Dr. Breakstone's assessment was that Rubbico suffered from lumbar radiculopathy and depression. _Id._ Dr. Breakstone continued Rubbico's prescription for Celexa. _Id._

---

21. Rubbico weighed 230 pounds, her pulse was 80 and her blood pressure was 110/70. Tr. 314.

On August 5, 2009, Rubbico had an appointment with Dr. Bell at which Rubbico complained of still having low back pain and lower extremity pain and she requested a change in her pain medication. Tr. 272-273. In the report of this appointment Dr. Bell stated that he last saw Rubbico on January 5, 2009, and that Rubbico had been seeing Dr. Schlifka and Dr. Breakstone "for continued care" and that Dr. Schlifka performed cervical surgery in October of 2008. Tr. 272. Dr. Bell noted that Rubbico was a smoker and that she "works at a travel agency full time but is currently not working." Id. Dr. Bell's objective physical examination findings were in toto as follows: "[A] 35-year old white female in no apparent distress. Her cervical range of motion is significantly limited. She holds herself in a very guarded position. Her gait is slow and coordinated. Upper extremity weakness is apparent in the right side greater than the left. Please note that the exam was limited due to a long discussion today." Id. Dr. Bell's diagnostic impression was that Rubbico suffered from neck pain, post cervical fusion, low back pain with radiculopathy, lumbar herniated nucleus pulposus at L4-5, and lumbar facet syndrome. Tr. 272-273. Dr. Bell declined to make any abrupt change in Rubbico's pain medication regimen and strongly encouraged Rubbico to return to physical therapy at John Heinz. Id.

On September 3, 2009, Rubbico had an appointment with Dr. Breakstone. Tr. 316-317. Although the report of this

appointment contains no abnormal objective physical examination or mental status findings, Dr. Breakstone's assessment was that Rubbico suffered from neck pain, back pain and depression. Id. Dr. Breakstone increased Rubbico's dosage of Celexa. Id.

On September 11, 2009, Rubbico underwent a lumbar myelogram which "showed no abnormalities." Tr. 412. A CT scan of the thoracic spine on the same day revealed the following:

> Dextroscoliosis of the mid and lower thoracic spine. No extrusion of the disk, spinal stenosis, or other abnormalities are seen in the spinal cord or canal. Incidentally noted, chronic emphysematous changes in both lungs.
>
> Slightly enlarged adrenals on both sides with presence of 2 cm x 2.4 cm mass in the left adrenal gland. Clinical correlation and further evaluation recommended.

Tr. 413.

On October 1, 2009, Rubbico had an appointment with Dr. Breakstone. Tr. 318-319. Although the report of this appointment contains no abnormal objective physical examination or mental status findings, Dr. Breakstone's assessment was that Rubbico suffered from asthma, neck pain, back pain and depression. Id. Dr. Breakstone renewed Rubbico's prescription for an inhaler and referred Rubbico to a rheumatologist. Id.

On October 5, 2009, Rubbico had an appointment with Dr. Kline "for physiatric re-evaluation." Tr. 332-333. The only abnormal physical examination findings recorded by Dr. Kline are as follows: "Demonstrates tenderness over the C4-5, C5-6 interspinous space with significant palpable muscle spasm in both

cervical paraspinal with limited active range of motion and diffuse tenderness about the lumbosacral area." Tr. 332. Dr. Kline found that Rubbico had normal "5/5 strength throughout" and normal sensation, deep tendon reflexes, toes were downgoing bilaterally, and no evidence of Hoffman's or Wartenberg's sign[22] in either upper extremity. Id. Dr. Kline's diagnostic impression was that Rubbico suffered from status post cervical surgery and fusion "with post laminectomy syndrome" and lumbosacral disc herniation. Id. Dr. Kline prescribed pain medications and instructed Rubbico to follow-up with rheumatology. Id.

On October 29, 2009, Rubbico had an appointment with Dr. Breakstone. Tr. 320-321. The report of this appointment contains no abnormal objective physical examination or mental status findings. Id. Dr. Breakstone's assessment was "adrenal mass (small)" and she ordered an MRI. Tr. 321.

An MRI of Rubbico's abdomen primarily focusing on the adrenal glands performed on November 4, 2009, was interpreted to

---

22. The Hoffman's sign is a neurological sign in the hand which is suggestive of spinal cord compression. The test involves tapping the nail on the third and fourth finger. "The test is positive for spinal cord compression when the tip of the index finger, ring finger, and/or thumb suddenly flex in response." Hoffman Sign: Red Flag for Cervical Myelopathy, Orthopod, http://www.eorthopod.com/content/hoffmann-sign-red-flag-for-cervical-myelopathy (Last accessed November 21, 2013). The Wartenberg's sign is "[o]ne traditional sign of ulnar neuropathy" but "actually a complaint of weakness . . . The patient also may express the complaint of weakness by saying 'my grip is weak.'" Ulnar Neuropathy Clinical Presentation, Medscape, http://emedicine.medscape.com/article/1141515-clinical (Last accessed November 21, 2013).

show "statistically . . . a benign lesion" and it was recommended that Rubbico have a follow-up MRI "in three months to assure lack of interval change." Tr. 307.

On November 16, 2009, Rubbico was evaluated by Victor Labbate, M.D., a specialist in rheumatology and internal medicine. Tr. 163-164, 365-366 and 410-411. At that appointment, Rubbico complained of headaches, numbness of the right arm and right leg, some weakness on the right side, urinary difficulties (polydipsia and polyuria), some visual problems, decreased cognitive function, mood swings, hearing loss, increased sensitivity to hot and cold, difficulty swallowing and constipation. Tr. 163. Dr. Labbate noted that Rubbico reported smoking 1 ½ packs of cigarettes per day.[23] Id. A physical examination revealed mild extremity weakness primarily on the right side and more pronounced in the leg than the arm. Tr. 164. Dr. Labbate also suspected foot drop but noted that Rubbico's reflexes were normal and she had a negative Babinski's sign.[24] Id. Dr. Labbate observed a livedo reticularis pattern on Rubbico's arms and legs but not her flank.

---

23. Individuals who smoke have a higher risk for poor recovery after surgery. John E. Sherman, M.D., Postoperative Care for Spinal Fusion Surgery, http://www.spine-health.com/treatment /spinal-fusion/postoperative-care-spinal-fusion-surgery (Last accessed November 21, 2013).

24. An abnormal response "called the Babinski's sign, is characterized by an upgoing big toe and fanning outward of the other toes." Plantar Response, Neuroexam.com, http://www.neuroexam.com/neuroexam/ content.php?p=32 (Last accessed November 21, 2013). The presence of the Babinski's sign suggests brain or spinal cord injury.

*Id.* Rubbico had no peripheral synovitis. *Id.* She had some spasm in the cervical spine and in the right paralumbar muscles and exhibited difficulty flexing (bending forward) her lumbar spine. *Id.* Dr. Labbate stated that an MRI of the lumbar spine "did not show any significant disc herniation" and she has "no significant thoracic problems of the spine." *Id.* Dr. Labbate did not review the diagnostic imaging of the cervical spine. *Id.* Dr. Labbate's diagnostic assessment was as follows: "I find no features here that suggest an inflammatory polyarthritis or ankylosing spondylitis syndrome. Findings are all neurologic. Certainly a vasculitis might be in the differential." *Id.* Dr. Labbate suggested further testing, including blood tests and a 24-hour oral intake of fluids and output of urine. *Id.*

On December 1, 2009, Rubbico had an appointment with Dr. Breakstone. Tr. 322-323. The report of this appointment contains no abnormal objective physical examination or mental status findings. *Id.* Dr. Breakstone's assessment was "small adrenal mass (likely benign)[,] fatigue, [and] polydipsia." Tr. 323.

On January 12, 2010, Rubbico had a follow-up appointment with Dr. Breakstone. Tr. 324-325. The report of this appointment contains no abnormal objective physical examination or mental status findings. *Id.* Dr. Breakstone's assessment was "viral syndrome"[25] and "lumbar radiculopathy." Tr. 325.

---

25. It appears that Rubbico was suffering from an intestinal virus because she complained of nausea and diarrhea. Tr. 324.

On January 18, 2010, Rubbico returned to Dr. Labbate, the rheumatologist, for a reevaluation. Tr. 364. Dr. Labbate noted in his report of this appointment that the "workup since her initial assessment was only noteworthy for finding a mildly abnormal lupus anticoagulant." Id. Dr. Labbate's report of this appointment reveals no abnormal objective physical examination or mental status findings. Id. Dr. Labbate's diagnostic assessment was that Rubbico suffered from "[c]hronic pain post decompression cervical surgery" and "[p]robably psychogenic polydipsia." Id. Dr. Labbate recommended a urologic consultation, the continued use of pain medications and a reassessment in 3 months. Id.

On March 19, 2010, Rubbico had an appointment with Dr. Bell "for physiatric re-evaluation." Tr. 334-335. The only abnormal physical examination findings recorded by Dr. Bell are as follows: "Demonstrates tenderness in the low aspect of the cervical spine with palpable muscle spasm at the base of both cervical paraspinals with limited active range of motion. Demonstrates diffuse tenderness about the lumbosacral region with negative straight leg raise test both in the seated and supine position, however, does demonstrate limited active range of motion." Tr. 334. Dr. Bell's diagnostic impression was that Rubbico suffered from status post cervical surgery and fusion with "post cervical laminectomy syndrome" and lumbosacral disc herniation. Id.

On March 16, 2010, Rubbico was evaluated by Scott Prince, D.O., on behalf of the Bureau of Disability Determination. Tr. 337-343. As part of the evaluation, Dr. Prince reviewed Rubbico's medical records. Tr. 337. A physical examination of Rubbico performed by Dr. Prince revealed that Rubbico was obese with a Body Mass Index of 33.9. Tr. 338. In reporting the results of the neurological portion of the examination, Dr. Prince stated as follows:

> Grip strength is 3/5 on the right, 5/5 on the left. Upper extremity strength was 4/5 on the right, 5/5 on the left. Lower extremity strength was 3/5 on the right, 5/5 on the left. Patellar reflexes +3 on the left, +1 on the right. She had a positive straight leg raising test on the right at 45 degrees. When attempting to test range of motion, she was unable to lift her leg all the way to check range of motion of her hip. Gait, she is dragging her right foot. She was unsteady on the right on her toes and her heels. She was able to squat about halfway down while holding on with both hands. She had pain in her back. She needed support to arise from the squat. She walked slowly and arose slowly from the exam table and from the exam chair. Fine and dextrous movements were decreased secondary to her decreased grip. She has decreased ability to hold things, decreased ability to grip things for use such as opening doors and opening jars. She appears to be able to button buttons and zip zippers without much difficulty.

Tr. 339. A mental status examination performed by Dr. Prince did not reveal any abnormal findings. Tr. 338. Dr. Prince's diagnostic impression was that Rubbico suffered from lumbar radiculopathy, cervical radiculopathy, degenerative disc disease, history of adrenal mass, and a stated history of asthma. Tr. 339.

Also, as part of the evaluation, Dr. Prince completed a statement of Rubbico's ability to perform work-related physical

activities and a range of motion chart. Tr. 340-343. Dr. Prince
found that Rubbico could (1) frequently lift/carry 10 pounds and
occasionally lift/carry 25 pounds; (2) stand and walk 4 hours
(cumulative) in an 8-hour workday; and (3) sit 8 hours with
alternating sitting and standing at her option. Tr. 340. Dr.
Prince further found that Rubbico could push/pull up to the limits
set for lifting/carrying; Rubbico could occasionally bend, kneel,
stoop, crouch, balance and climb; and she had some unspecified
limitations with respect to reaching, handling, fingering, and
feeling but no environmental limitations. Tr. 341. The range of
motion chart reveals that Rubbico's cervical lateral flexion both
right and left was reduced from 40 degrees to 20 degrees; her
cervical flexion from 30 degrees to 10 degrees; her cervical
extension from 30 degrees to 15 degrees; her cervical rotations
from 45 degrees to 15 degrees both right and left; and her lumbar
flexion from 90 degrees to 75 degrees. Tr. 343. Rubbico's range of
motion of the elbows and wrists was completely normal. Tr. 342.

On March 30, 2010, Dennis C. Gold, Ph.D., a psychologist
reviewed Rubbico's medical records on behalf of the Bureau of
Disability determination and concluded that although Rubbico
suffered from depression it was a non-severe impairment. Tr. 344-
355. Dr. Gold found that Rubbico had no mental functional
limitations with respect to activities of daily living and
maintaining social functioning, only mild difficulties with

26

concentration, persistence and pace, and no repeated episodes of decompensation of an extended duration. Tr. 354.

On April 10, 2010, Rubbico returned to Dr. Labbate, the rheumatologist, for a reevaluation. Tr. 363. Rubbico told Dr. Labbate that she was denied social security disability benefits. Id. Dr. Labbate noted in his report of this appointment that Rubbico reported "no major changes in the interval" from the last time she was seen by him. Id. The results of a physical examination were essentially normal other than the following: "Joint exam does show some weakness in the right arm compared to the left. She has definite weakness of her right leg compared to the left." Id. Rubbico had normal reflexes and a negative Babinski's sign. Id. Dr. Labbate's assessment was that Rubbico suffered from chronic cervical disc disease related to her cervical spine surgery and a chronic S1 radiculopathy. Id. Dr. Labbate in the plan section of the report of this appointment stated without specifying any functional limitations that Rubbico was "incapable of employment at this point because of her neurological deficit and pain." Id.

On May 10, 2010, Rubbico was examined by Ronald I. Harris, M.D., an endocrinologist, located in Wilkes-Barre. Tr. 369-374. Other than being obese, the results of a physical examination were essentially normal, including she was alert and oriented to person, place and time with fluent speech, no focal

motor or sensory deficits, a normal gait and normal reflexes. Tr. 373-374.

On May 18, 2010, Rubbico had an MRI of the brain which revealed "no significant intracranial abnormality[.]" Tr. 368.

On June 23, 2010, Rubbico was again examined by Dr. Harris. Tr. 436-441. Other than being obese and having some difficulty with extending her right leg, the results of a physical examination were essentially normal, including she was alert and oriented to person, place and time with fluent speech and a normal gait and normal reflexes. Tr. 441.

On June 26, 2010, Rubbico had an MRI performed of the abdomen which revealed a small nodule on the left adrenal gland which appeared unchanged from the previous MRI performed on November 4, 2009. Tr. 307 and 450. The report of the June 26th MRI indicated that the "lesion most likely represents a benign adrenal adenoma." Id.

On July 19, 2010, Rubbico returned to Dr. Labbate, the rheumatologist, for a reevaluation. Tr. 415. Dr. Labbate noted that the "adrenal abnormality [was] stable[.]" Id. The physical examination findings and diagnostic assessment were essentially the same as the findings and assessment noted at the previous examination on April 10th. Id. On July 19th, Dr. Labbate also completed a work capability sheet and noted that Rubbico was "incapable of employment." Id. Dr. Labbate stated that Rubbico could not lift, carry, push or pull any weight of materials and

could never sit, bend, climb, squat, kneel, or crawl and she could only occasionally stand, walk and reach. Tr. 416. Dr. Labbate did not indicate when these limitations accrued or how long they would last. Id.

On July 20, 2010, Rubbico had a nerve conduction study and electromyography performed of the right upper and lower extremity. Tr. 452. These diagnostic tests revealed "no electrodiagnostic evidence of peripheral neuropathy, myopathy, right cervical radiculopathy or right lumbar radiculopathy." Id.

On August 9, 2010, Dr. Kline wrote a letter to Rubbico's attorney regarding Rubbico's work abilities. Tr. 537-539. The record reveals that the last appointment that Rubbico had with Dr. Kline prior to Dr. Kline writing the letter was on October 5, 2009. Id. In the letter, Dr. Kline stated as follows:

> Secondary to the motor vehicle related injury that [Rubbico] sustained, I would limit her to a <u>sedentary to light modified capacity level of work, lifting or carrying up to a maximum of 15 pounds</u>, with the avoidance of any kind of repetitive bending or twisting of either the cervical or lumbosacral spine. The restrictions that I placed upon [Rubbico] are permanent in nature. These restrictions are based upon the fact that [Rubbico] clearly demonstrates substantial neck pain, having undergone a major surgical intervention encompassing the C4 corpectomy with C3 through C5 laminectomy and fusion, for which she exhibits post-laminectomy syndrome, as well as lumbosacral discogenic pain.
>
> These conditions clearly would interfere with [Rubbico's] work activities as well as her activities of daily living secondary to the degree of pain she experiences from them.
>
> Not only has it provided her with permanent and ongoing disability, but also more probably than not

has limited her longevity of her overall work
activities.

[Rubbico] clearly would demonstrate substantial
restrictions in regards to her lifting, continuous
sitting or standing, or cumulative standing, with
the lifting and carrying restrictions limited to a
sedentary to light modified capacity. She should
avoid any repetitive bending or twisting of both
the cervical and lumbosacral spine, with sitting
and standing limited to approximately ½ hour in
one location prior to allowing her to alter her
position for comfort measures.

Tr. 538-539 (emphasis added).

On August 19, 2010, Dr. Breakstone completed a work
capability sheet and noted that Rubbico was unable to work. Tr.
300. The record reveals that the last appointment that Rubbico
had with Dr. Breakstone prior to Dr. Breakstone completing the
work capability sheet was on January 12, 2010. Id. Dr. Breakstone
stated that Rubbico could never torso lift, leg lift, shoulder
lift, or overhead lift, and she could only occasionally "12"
lift," carry, push, and pull 10 pounds. Id. Dr. Breakstone
further stated that Rubbico could never, bend, climb, squat,
kneel, crawl, push/pull with her hands, or engage in high or low
speed assembly and could only occasionally use arm and foot
controls, and only occasionally engage in simple grasping and fine
work. Id. Dr. Breakstone did not indicate when these limitations
accrued or how long they would last. Id.

On August 25, 2010, Dr. Breakstone wrote a letter to
Rubbico's attorney regarding Rubbico's work abilities. Tr. 296-
299. The record reveals that the last appointment that Rubbico

30

had with Dr. Breakstone prior to Dr. Breakstone writing the letter was on January 12, 2010.[26] Id. In the letter, Dr. Breakstone stated as follows:

> This patient is extremely complicated since we do not have an exact diagnosis to date, it is very difficult to say with any certainty the prognosis of this patient. She is certainly incapacitated and completely disabled and unable to work in any capacity at the present time. I have filled out her evaluation form regarding specific duties such as lifting, sitting, standing, walking. These are self-explanatory. The patient remains unable to stand for any length of time as her balance is not good. Sitting is very limited because of her back pain. She can sit no longer than 15 minutes at a time. As was previously stated, she is unfit for work in any capacity.

Tr. 298-299. Dr. Breakstone goes on to mention the number of medications that Rubbico is taking and that they would have a sedating impact and that "it is impossible to tell whether [her condition] is permanent[.]" Tr. 299.

Within a month of Dr. Breakstone writing the above-mentioned letter, Rubbico had an appointment with Adil A. Khan, M.D., a neurologist, on September 14, 2010, regarding generalized weakness. Tr. 460-463. The report by Dr. Khan of this appointment indicates that Rubbico was smoking 1 pack of cigarettes per day. Tr. 461. The results of a physical examination were essentially normal other than the following: "poor hand grips, weak abduction

---

26. In the letter, Dr. Breakstone stated that the last "visit with Kristen was on August 18, 2010." Tr. 298. However, there are no such treatment notes in the record. Dr. Breakstone also states that Rubbico "came back for follow-up June 15, 2010 stating that she did not feel any better and in fact she felt worse." Id. The record does not contain any treatment notes of an appointment on June 15, 2010, with Dr. Breakstone.

at right shoulder (poor effort), rest of motor exam [within normal limits] with variable effort with right lower extr[e]mity muscles. Diffuse tenderness in muscles of neck, shoulder, scalp and lower back." Tr. 461-462. Dr. Khan noted no sensory deficits, that Rubbico had a wide-based normal and cautious gait, carried a cane but Dr. Khan did not see her use it. Id. Rubbico's weight at this appointment was 194 pounds giving her a Body Mass Index of 30.4 which placed her in the obese category. Id. Dr. Khan's assessment was that Rubbico suffered from cervical spondylosis and made the following comment under that diagnosis: "Arthralgia, muscle pain, and other associated symptoms are probably from a non neurological cause, no current evidence of Central or Peripheral Demyelinating Disease." Id. Dr. Khan recommended that Rubbico follow-up with a rheumatologist and stated that no further neurological follow-up was recommended. Id.

On September 22, 2010, Dr. Kline sent a letter to Rubbico's attorney in which he stated as follows: "In regards to an eight hour day, it would be my professional opinion that [Rubbico] would warrant no restriction on sitting. Standing and walking would be limited to one to two hours requiring breaks as needed for comfort measures." Tr. 540. Dr. Kline further noted that "[f]rom a subjective standpoint, [Rubbico] may also feel the necessity to lay down for breaks." Id.

On October 13, 2010, Rubbico had an appointment with Michael T. Hatrak, a certified registered nurse practitioner, and

then Brett Alan Schlifka, D.O, a neurosurgeon. Tr. 472-474. The results of a physical examination were essentially normal. Tr. 472-473. Rubbico weighed 192 pounds which still placed her in the obese category. Tr. 472. Rubbico's strength in the left upper extremity was normal and reduced in the right upper and lower extremities. Tr. 473. Rubbico had decreased sensation in the right upper and lower extremity compared to the left. Id. Reflexes were normal. Id. It was noted that her gait was abnormal and she walked with a cane. Id. The diagnostic assessment apparently written by Mr. Hatrak merely indicated her history of spinal surgery and referenced Rubbico's subjective complaints. Id. The plan set forth in the report of the appointment included a referral to physical therapy and further diagnostic imaging. Id. At the end of the report Dr. Schlifka merely states that he examined the patient and agrees "with above. No instability on CS F/E, LS X rays shows a small anterolisthesis L5/S1. Given patient's [symptoms], I would recommend obtaining contemporary imaging MRI Brain . . . [cervical spine] . . . and . . . [lumbar spine] . . . ." Tr. 474.

Diagnostic imaging of the cervical spine on or about October 18, 2010, revealed "[s]tatus post anterior fusion C3 through C5. Hypertrophic degenerative changes C6 and C7. Mild instability at the C2-C3 level." Tr. 479.

On November 15, 2010, Rubbico underwent an MRI of the lumbar spine which was compared to a prior MRI and revealed no

33

appreciable interval change.[27] Tr. 485. The report of this MRI specifically states as follows: "Mild levoscoliosis and hemangioma in T12 remain unchanged. No extrusion of the disk, spinal or foraminal stenosis seen." Id. On the same day, Rubbico had an MRI of the cervical spine which revealed a minimal interval change from a previous MRI.[28] Tr. 486. The MRI of the cervical spine revealed the prior cervical surgery and the post-surgical changes and mild spinal stenosis at the C6-C7 level. Id.

On November 23, 2010, Rubbico had an appointment with Joseph Schulz, D.O., a general surgeon, regarding an adrenal mass. Tr. 489-492. Rubbico told Dr. Schulz that "she was sent . . . by neurosurgery for 'Adrenal Cancer'" and that "she has known about her adrenal mass since Sept 2009." The results of a physical examination performed by Dr. Schulz were essentially normal. Tr. 491-492. The assessment of Dr. Schulz was that it was a benign mass and there was no need for surgery. Tr. 492.

On December 9, 2010, Rubbico had a follow-up appointment with Dr. Schlifka. Tr. 508-511. The results of a physical and mental status examination were essentially normal. Tr. 510. Rubbico did have "mild to moderate spasm of the paralumbar muscles," "[t]ender paralumbar muscles bilaterally, some "right

---

27. The report of this MRI refers to a previous MRI of February 4, 2009. However, the record reveals prior MRIs of March 31 and April 24, 2008 and July 18, 2009.

28. The report of this MRI refers to a previous MRI of April 24, 2009. However, the record reveals a prior MRI of June 26, 2008.

sided weakness 4/5" and an abnormal tandem gait.  Tr. 510-511.
However, she had a negative straight leg raising test, a normal
sensory exam, normal muscle bulk and tone, normal reflexes and
normal judgment, mood, memory, speech and comprehension. Id.  Dr.
Schlifka reviewed an MRI of the cervical spine and recommended
cervical surgery, a discectomy, at the C5/6 and C6/7 levels. Tr.
511.  The appointment ended with the understanding that Rubbico
would call Dr. Schlifka to let him know whether she wanted to
proceed with surgery.  Id.

**DISCUSSION**

          The administrative law judge, at step one of the
sequential evaluation process, found that Rubbico had not engaged
in substantial gainful work activity since October 21, 2008, the
alleged disability onset date. Tr. 17.

          At step two of the sequential evaluation process, the
administrative law judge found that Rubbico had the following
severe impairments: "degenerative disc disease and obesity[.]" Id.
The administrative law judge stated that these "impairments are
severe because they cause significant functional limitations in
the claimant's ability to perform basic work activities." Id.

          At step three of the sequential evaluation process, the
administrative law judge found that Rubbico's impairments did not
individually or in combination meet or equal a listed impairment.
Tr. 17-18. In finding that Rubbico's impairments did not meet the
criteria of any listing, the administrative law judge relied on

the opinions of the state agency consultants and the forms completed by them. Tr. 17-23.

At step four of the sequential evaluation process, the administrative law judge found that Rubbico could perform skilled, sedentary work which permitted a sit/stand option with occasional postural movement, except she could never climb ladders, ropes or scaffolds. Tr. 18. Based on that residual functional capacity, the ALJ found that Rubbico could perform her past relevant skilled, sedentary work as a customer service assistant, and in the alternative she could also perform other sedentary jobs.

In setting this residual functional capacity, the administrative law judge reviewed the medical records and considered several other items including the opinions of the state agency consultants and the opinion of Dr. Kline who found that Rubbico was limited to sedentary or light duty work. Tr. 18-24. Also, in arriving at this residual functional capacity the administrative law judge found that Rubbico's statements about her functional limitations were not credible and gave little weight to the opinions of treating physicians who indicated that Rubbico was disabled. Id.

Based on the above residual functional capacity, the administrative law judge, as stated above, found that Rubbico could perform her past relevant work as a customer service assistant and in the alternative the administrative law judge, at step five of the sequential evaluation process, found based on the

36

testimony of the vocational expert that Rubbico could perform work as an assembler of small parts, garment inspector and a ticket taker, and that there were a significant number of such jobs in the regional and national economies. Tr. 25.

The administrative record in this case is 541 pages in length, primarily consisting of medical and vocational records. The administrative law judge did an excellent job of reviewing Rubbico's medical history and vocational background in his decision. Tr. 15-26. Furthermore, the brief submitted by the Commissioner sufficiently reviews the medical and vocational evidence in this case. Doc. 8, Brief of Defendant.

Rubbico argues that the administrative law judge erred by (1) finding that Rubbico had the residual functional capacity to perform her past relevant work as a customer service assistant, (2) finding that the objective medical evidence does not support a claim of disability, (3) rejecting the opinions of treating physicians, and (4) failing to appropriately consider Rubbico's upper extremity limitations. The Court has thoroughly reviewed the record in this case and finds no merit in Rubbico's arguments.

The Social Security regulations require that an applicant for disability insurance benefits come forward with medical evidence "showing that [the applicant] has an impairment(s) and how severe it is during the time [the applicant] say[s] [he or she is] disabled" and "showing how [the] impairment(s) affects [the applicant's] functioning during the

time [the applicant] say[s] [he or she is] disabled." 20 C.F.R. §
404.1512(c).

No treating or examining physician has indicated that
Rubbico suffers from physical or mental functional limitations
that would preclude her from engaging in the limited range of
work set by the administrative law judge in his decision for the
requisite statutory 12 month period.[29]  No physician indicated
that Rubbico was incapable of engaging in the limited range of
sedentary work set by the ALJ on a full-time basis.

The administrative law judge relied on the opinion of
Dr. Prince, the state agency physician who examined Rubbico.  The
administrative law judge's reliance on that opinion was
appropriate.  See Chandler v. Commissioner of Soc. Sec., 667 F.3d
356, 362 (3d Cir. 2011)("Having found that the [state agency
physician's] report was properly considered by the ALJ, we readily
conclude that the ALJ's decision was supported by substantial
evidence[.]").  The record does not contain any statement from a
treating physician that Rubbico had limitations in the use of her
upper extremities that would preclude her from engaging in work as
a customer service assistant and the bare medical records do not
provide support for such a conclusion.  In fact, Dr. Prince's

--------------------------------------------------

29.  To receive disability benefits, the plaintiff must
demonstrate an "inability to engage in any substantial gainful
activity by reason of any medically determinable physical or
mental impairment which can be expected to result in death or
which has lasted or can be expected to last for a continuous
period of not less than 12 months."  42 U.S.C. § 432(d)(1)(A).

38

evaluation indicates that Rubbico had a modest decrease in grip

strength on the right and absolutely normal grip strength on the

left. Dr. Prince further indicated that Rubbico had completely

normal range of motion of the elbows and wrists and appeared "to

be able to button buttons and zip zippers." Tr. 339 and 343.

Also, electrodiagnostic testing revealed no evidence that Rubbico

suffered from peripheral neuropathy, myopathy or radiculopathy in

the right upper extremity. Tr. 452. A treating physician, Dr.

Kline, stated that Rubbico would have no problem sitting during an

8-hour day and could lift/carry up to 15 pounds. Tr. 538-539. The

residual functional capacity set by the ALJ is consistent with the

opinion of a treating physician and a physician that examined

Rubbico on behalf of the Bureau of Disability Determination.

The administrative law judge rejected the disability

opinions of Dr. Breakstone and Dr. Labbate. The Court of Appeals

for this circuit has set forth the standard for evaluating the

opinion of a treating physician in <u>Morales v. Apfel</u>, 225 F.3d 310

(3d Cir. 2000). The Court of Appeals stated in relevant part as

follows:

> A cardinal principle guiding disability eligibility
> determinations is that the ALJ accord treating
> physicians' reports great weight, especially "when
> their opinions reflect expert judgment based on a
> continuing observation of the patient's condition
> over a prolonged period of time." . . . The ALJ
> must consider the medical findings that support a
> treating physician's opinion that the claimant is
> disabled. In choosing to reject the treating
> physician's assessment, an ALJ may not make
> "speculative inferences from medical reports" and
> may reject "a treating physician's opinion outright

only on the basis of contradictory medical evidence"
and not due to his or her own credibility judgments,
speculation or lay opinion.

Id. at 317-18 (internal citations omitted). The administrative law
judge is required to evaluate every medical opinion received. 20
C.F.R. § 404.1527(d). In the present case, the administrative law
judge in his decision specifically addressed the opinions of Dr.
Breakstone and Dr. Labbate as well as the credibility of Rubbico.
Tr. 19 and 23.

The social security regulations specify that the opinion
of a treating physician may be accorded controlling weight only
when it is well-supported by medically acceptable clinical and
laboratory diagnostic techniques and is not inconsistent with
other substantial evidence in the case. 20 C.F.R. §
404.1527(d)(2); SSR 96-2p. Likewise, an administrative law judge
is not obliged to accept the testimony of a claimant if it is not
supported by the medical evidence. An impairment, whether
physical or mental, must be established by "medical evidence
consisting of signs, symptoms, and laboratory findings," and not
just by the claimant's subjective statements. 20 C.F.R. §
404.1508 (2007). The administrative law judge appropriately
considered the contrary medical opinion of Dr. Prince and the
objective medical evidence and concluded that the opinions of Dr.
Breakstone and Dr. Labbate were not adequately supported by
objective medical evidence consisting of signs, symptoms and

laboratory findings. The administrative law judge in rejecting

the opinion of Dr. Breakstone stated in part as follows:

> Treating source Dr. Breakstone opined that the claimant
> is precluded from gainful employment due to her
> impairments. She opined the claimant will "not be
> able to return to any gainful employment". She limited
> her sitting to fifteen minutes, but stated the claimant
> could sit, stand or walk occasionally/one third of the
> day but never bend, climb, squat, kneel or crawl
> (Exhibit 4F). With the exception of the standing and
> walking one third of the workday, this opinion is not
> supported by Dr. Breakstone's own treatment records
> or other evidence of record. As stated above her
> objective findings were non-existent after the first
> two visits. The few objective findings she had clearly
> do not evidence a disabling condition. Dr. Breakstone
> appears to have relied almost exclusively on the
> claimant's subjective complaints rather than on any
> objective evidence of record.

Tr. 23. The administrative law judge in rejecting the opinion of

Dr. Labbate stated in part as follows:

> Dr. Victor Labbate, treating source also opined the
> claimant is "incapable of employment" because of
> "neurological deficits and pain." Dr. Labbate found
> arm and leg weakness and nothing more on his objective
> findings yet he opines she is disabled. Dr. Labbate
> also opined that the claimant could "never" sit, bend,
> climb, squat, kneel, crouch, lift, carry, push or pull.
> Clearly, his opinion is contradictory to his findings
> and the record as whole. In [a]ddition, the claimant
> testified that she could sit for an hour and she sat
> through the hearing with no apparent difficulties.

Id. The administrative law judge gave an adequate explanation for

rejecting the opinions of Dr. Breakstone and Dr. Labbate.

As for Rubbico's argument that the administrative law

judge did not properly consider her subjective complaints, the

administrative law judge was not required to accept Rubbico's

claims regarding her physical or mental limitations. See Van Horn

41

v. Schweiker, 717 F.2d 871, 873 (3d Cir. 1983)(providing that credibility determinations as to a claimant's testimony regarding the claimant's limitations are for the administrative law judge to make). It is well-established that "an [administrative law judge's] findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since [the administrative law judge] is charged with the duty of observing a witness's demeanor . . . ." Walters v. Commissioner of Social Sec., 127 F.3d 525, 531 (6th Cir. 1997); see also Casias v. Secretary of Health & Human Servs., 933 F.2d 799, 801 (10th Cir. 1991)("We defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess the witness credibility."). Because the administrative law judge observed and heard Rubbico testify, the administrative law judge is the one best suited to assess her credibility.

The Court is satisfied that the administrative law judge appropriately took into account all of Rubbico's physical and mental limitations established by the medical records in setting Rubbico's residual functional capacity. The administrative law judge concluded that Rubbico could engage in a limited range of sedentary work. That conclusion is supported by the opinion of the state agency psychologist and physician as well as the opinion of Dr. Kline, a treating physician.

The Court's review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence. Therefore, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner will be affirmed.

An appropriate order will be entered.

**United States District Judge**

Dated: November 27, 2013